We'll move to the third case of the day. 22-13 513 Schrier v. Qatar Islamic Bank. Mr. Sellers is here for the appellant. Mr. Giffray, is that correct? That's correct. Very well. Well, don't thank me. Thank my courtroom deputy. He gives me phonetic, he gives me pronunciations. So, Mr. Sellers, you're up first. You have ten minutes. Yes, sir. Whenever you're ready. May it please the court, Matthew Sellers for the appellant, Matthew Schrier. Mr. Schrier endured seven months of torture and imprisonment at the hand of two Syrian terrorist groups, which were financed in part by the appellee, Qatar Islamic Bank. The court errs in dismissing this action to hold the bank accountable for lack of personal jurisdiction. Mr. Schrier has satisfied the three prerequisites for the exercise of jurisdiction. He served the complaint and summons. He identified statutory bases for jurisdiction and jurisdiction would comport with due process. Can I ask a question up front? And I'm going to ask both sides. I hope this isn't the dumbest question of all time. It may be. Why are the parties so wrapped around the axle about whether service was proper under the ATA? If all agree that there was service eventually via Federal Express or whatever in Doha? Under the ATA, the court can aggregate all of QIB's contacts with the United States. That's true under Rule 4K2 as well. But QIB's contested that Rule 4K2 applies. And that is why we contend that service was proper in the United States. OK. So the key to this appeal, I think, is the due process issue. And so I'll start there. The district court made a legal error in holding that conspiracy jurisdiction is improper under Rule 4K2. That was a legal ruling reviewed de novo. Conspiracy jurisdiction comports with due process. Every court of appeals to have addressed this under a state long arm statute has so far. Rule 4K2 authorizes jurisdiction consistent with the United States Constitution and laws. This court said in the consolidated development case that that means jurisdiction consistent with due process. There's no principled reason why conspiracy jurisdiction would be permissible under a state long arm statute, but not under the Fifth Amendment due process clause. Counsel, I can tell you that I completely agree with that last statement. And here, let me tell you what the trouble I'm having with it. It's not that there aren't four other circuits that have essentially adopted the view that you've taken. My only concern is the apparent tension, and I want you to address it, between statements made in Walden and Burger King about the defendant being the one to have the context and how that interacts with the theory of conspiracy jurisdiction generally. So conspiracy is a way of imputing other actors' conduct to the defendant. And the Supreme Court has said, for example, in the Daimler case, that a defendant can create context with a forum sufficient for jurisdiction via an agent. The theory of conspiracy is that... I agree with that, because an agent is essentially acting on behalf of somebody else, so there's no doubt that that's true. In other words, a corporation isn't a corporation. It acts between people, and an agent of the corporation acts for it, so that would create the context there. Conspiracy is a little different. You're not quite an agent of someone else if you're a conspirator of theirs. I've never seen an overlap or an equalization of agency law and conspiracy law. How do we address the Supreme Court's concern, it seems, on the due process side with context of the defendant with context that are made clear with other people that so-and-so happens to be conspiring with in this particular instance? I submitted a 28-J letter last week. The Sotloff case in the Southern District of Florida addresses this. On the allegations of this case, it's not just a conspiracy. It's knowledge that QIB services are being used to finance the terrorist groups that harmed Mr. Schreier. I think that takes it beyond just part of an agreement. There's knowledge that these terrorist groups are directing activities toward the United States, and so the awareness that they have joined a conspiracy that's in part directed at the United States I think satisfies the requirement that they reasonably foresee being hailed into court. If we agreed that conspiracy jurisdiction is a thing under 4K, would you advocate for us adopting the Schwab 2 test as the basis for that? Yes, from the Second Circuit, and so it would be an agreement between the conspirators, an act of participation in the conspiracy by QIB, and then some act in or directed at the forum. Meaning the bank would have to know or direct it specifically at the United States, right? Or the conspirators would have to direct it. The bank knowing that that was going to happen. The allegations I think are ample that QIB was aware that its services were being used to finance the News for Front. There's allegations that they opened an account on behalf of the minor son of a Qatari national who was very prominently promoting a fundraising campaign for the News for Front specifically. But wasn't he declared, didn't the U.S. declare, put him on the terrorist list like two years after your client was released? That's true, but the account, the fundraising campaign for which the account was being used was highly public. The allegations state that it was possibly the most visible campaign in Qatar for financing the News for Front. There were social media posts over Twitter directing donations to that account. So there's a lot in there regarding knowledge or at least imputed knowledge from their due diligence process that they should have known what this account was for. That the account was for the purpose of raising money for this group and that the bank knew that this group was involved in terrorism. The part that I'm having trouble with is the including at the United States part. So the allegations are that this group was involved in overthrowing the current Syrian government and putting in an Islamist state equivalent to ISIS in Syria. That isn't itself directed at the United States. Where is the United States piece? And tell me the specific allegations, not just knowledge, but the plausible allegation that there is knowledge, that they knew this activity would have been directed at the United States. As to the News for Front itself, there's allegations that Mr. Farr was kidnapped precisely because he was American in order to induce the United States government to pay a ransom. There's no doubt that NURSA had that. The part about the bank knowing that NURSA was doing this directed at the United States. The kidnapping and ransoming of a foreign national is a common tactic of a terrorist group. It's, I think, foreseeable that supporting a terrorist group active in the Middle East, a place where the United States has certainly focused its foreign policy attention, that the News for Front's conduct would be directed at the United States. In addition to the conspiracy, we've identified transactions in QIB's correspondent bank in New York that create minimum contacts with the United States. Now, we preserve our argument that the Fifth Amendment does not require the minimum contacts analysis, but since this court's precedent requires that, those six transactions would also support the exercise of jurisdiction. Now, the district court erred in two respects. The first was in totally discounting the three post-escape transactions. Can I ask you about that? Yes. What is the fairest way for me to read the district court order? Is it that, as a matter of law, it cannot consider post-complaint conduct? Or is it that, in this case, that these allegations are insufficient? So I think the former, what the district court said, was that as a matter of simple logic, post-complaint conduct cannot relate to the claims. And that's exactly the kind of reasoning that the Supreme Court rejected in Ford. There's no causal relationship required. But saying that contact must predate the tortious conduct, the contact with the United States, that's another way of saying causation. And so that is an error also. Well, it seems to me there has to be some causation or some causal relationship. It doesn't need to be heightened, doesn't need to be but-for, but there has to be some connection between those two things. What is the connection between the, and I think there's really one, there's really one bank transaction that's really at issue here, and that's the one to the person who's alleged to be, or the account that's alleged to be a terrorist account, to what happened to your client. Yes. So I think the Supreme Court rejected causation in Ford. I think all that's required is a relationship. And in this case, that transaction went to, as you say, the account that was part of this fundraising campaign. It was, that campaign began before Schreyer's escape. The campaign began no later than May 2013. QIB, although we have evidence of this one transaction in the United States, had been, its services had been used for that campaign for months beforehand, and they were used for months after, I mean through to the summer of 2013, when the Qatari government shut down this campaign because there was no defined material. But this transfer occurs, I guess, three months after your client is released. So it's not like a couple days, a couple weeks, it's three months later. That's right, but it's, again, same campaign, the same account. And that, financing that campaign is the conduct for which Mr. Schreyer seeks to hold QIB liable. I mean, that is the essence of the substantive claims. But not in general, related to his kidnapping and his torture. Correct. So if six months, a year from now, there was a transaction, could we say that there's some relationship between the transaction and what happened to your client? Well, this transaction, I want to stress again, is part of the same campaign that was going when he was kidnapped, and that provides the relationship that supports personal jurisdiction. It would seem that at some point that relationship's cut off in time, is it not? Well, if this campaign had gone for years and years, I don't know. But a transaction that was separate from this campaign, I would agree with the court. But this transaction was part of the very thing that Schreyer seeks to hold QIB accountable for. I'll reserve my remaining time. Thank you so much. Mr. Giuffre, let's hear from you. Good morning, Your Honors. Michael Giuffre for Qatar Islamic Bank. Your Honors, everybody agrees that the events that occurred in Syria that led to the kidnapping and confinement of Mr. Schreyer were horrible. But those events are not connected to Mr. Schreyer's injuries, this forum, and Qatar Islamic Bank, much less having a sufficient connection to establish personal jurisdiction in the Southern District of Florida. I'd like to start with addressing Rule 4K2, then go into the Patriot Act issue under the ATA, and then finish briefly with Florida long-arm statute issues. But to answer Your Honors' question earlier on about why service in the U.S. on the Patriot Act agent is so important, the only way that the appellant is able to establish jurisdiction under the Anti-Terrorism Act is to serve the bank in the United States. Without that, the only thing that the plaintiff or the appellant can look to is the Rule 4K2 or long-arm statute basis for jurisdiction. For 4K2, the alleged connections between QIB and what happened to the appellant in Syria don't come close to showing the sort of minimum contacts that have been found to give rise to jurisdiction. The appellant says that there must be a relationship among QIB, the forum, and the litigation to exercise personal jurisdiction. And there are two overriding reasons why that concession requires a finding that there's no personal jurisdiction. First, the argument depends on making a showing to this court that the district court did not apply that standard. And the appellant argues that the district court said that a transaction must cause plaintiff's injuries in order to establish personal jurisdiction. Counsel, do you agree that if we had, if the defendant here was the terrorist group, and assuming you could serve it, and it was an entity of some sort, and that that was the defendant in front of us, that we would have personal jurisdiction over that because of the conduct that was directed towards the United States? Do you agree with that? Not necessarily, Your Honor. The morass of Anti-Terrorism Act cases is all over the place with respect to the effects test. It seems pretty consistent that the terrorist group, and point me to one where the terrorist group has not been found to have personal jurisdiction, but it seems pretty clear that the terrorist group, not the banks, not anyone funding it, the group itself, where it commits a terrorist act aimed at the United States, is... Your Honor, I am not here to defend the NUSRA front for sure, and I do think... I understand, Your Honor. ...it's a much clearer case for personal jurisdiction over the NUSRA. So let's say we... I'm not holding you to a concession. Let's just assume that's the case. If that is the case, then how is a conspirator to them... Well... ...not someone that we have jurisdiction or there's not personal jurisdiction under 2K, under 4K? I think first you have to look at the effects test that we're talking about, directing conduct to have an effect in the United States. No, I don't think I do. I think I need to look at the conspiracy jurisdiction. So why would we not adopt a conspiracy jurisdiction doctrine that says that the conspirators who direct conduct and knowingly direct conduct that are involved in the conspiracy that directs conduct towards the terrorist conduct towards the United States not also looped in for personal jurisdiction purposes? Yes, Your Honor. I think that the fact that we have Walden, where the Supreme Court has said that the plaintiff must establish that the defendant himself caused the contacts in the U.S. in order to exercise personal jurisdiction is required, and the Court also said that attenuated contacts with others is not going to be sufficient. So you actually substituted a word in there, and I want to talk about that word. So what Walden actually says is that the forum, quote, must arise out of contacts that the defendant himself creates with the forum. So it's the creation by the defendant of the contacts, not the defendant's contacts itself, but the creation of those contacts that drives what happens here, that drives the jurisdictional analysis. And that makes sense because let's take a corporation, for example, which is that language comes from Burger King. So if the corporation is directing activity at Florida, then Florida would have jurisdiction, even if the corporation itself is not headquartered there and its officers are somewhere else, and everyone understands that. If the conspiracy or the defendant through the conspirators is directing, is creating contacts with the forum, then isn't that enough under Walden and Burger King? No, Your Honor, and the reason for that is we're talking about Rule 4K2. Rule 4K2 is an entirely different animal than other bases for jurisdiction because it only applies where you have contacts with the U.S. but not sufficient contacts with the U.S. to establish jurisdiction within any state's court of general jurisdiction. If you're talking about conspiring to cause an effect in the United States or directing actions to the United States, that comes in under a state long-arm statute where a court finds that conduct is enough. But, counsel, a lot of these state long-arm statutes essentially track the exact same language that's in 42K. It just uses the we give jurisdiction to the limits of the Constitution. In fact, some of the conspiracy jurisdiction cases from the other circuits are actually interpreting long-arm statutes that are essentially identical to what we have in 42K. I just fail to see a linguistic difference. I'm just having trouble seeing it. Well, many of the long-arm statutes we're looking at in these cases do explicitly provide for conspiracy jurisdiction. But the next step is if that conspiracy causes effects or is directed at the U.S. to the point where jurisdiction would be established within a single state, which is what we're talking about in the context of due process and long-arm statutes, Rule 4K2 can never apply. I know, but we're beyond that, it seems. I mean, no one's contesting at this point, and you're not saying that there is context with any state. I think Judge Easterbrook's framework that both parties seem to adopt makes a lot of sense, that if no one's putting forth a state, then we sort of — and the one state that could be put forth or has been is insufficient, then 4K2 applies. So we're in 4K2 land. My only question is once we're in that land and we aggregate context within the United States, why is under Walden and Burger King the context that the conspirator creates at the forum here in the United States not sufficient? Well, that's where you look at the factual nature. It's a very specific factual inquiry, and that's where you look at the factual nature of what has been alleged. And the appellant has relied on three cases in particular to make this argument, Mwani, Morris, and Woltz. And the Morris case, I think, is helpful to put this in context because in Morris, the court said that to establish jurisdiction over a terrorist, and in this context, they're talking about people who are also supporting or part of this terrorism, that the plaintiffs must make a prima facie showing that each defendant's personal or direct participation in the conduct gave rise to the plaintiff's injuries. So if we're talking about personal or direct participation in a conspiracy, then you look at the cases they cited. Unlike Osama bin Laden and Mwani, QIB did not orchestrate an attack on an embassy or bomb the World Trade Center, which is specifically incorporated in that case. Yeah, but the allegations are that NRSA, as I understand it, is in the business of targeting and kidnapping Americans who are in the Middle East as a way to extract money and concessions from the United States. You're right that it's not a bombing. You're right that it's not an embassy or something like that. But how is that any less of a terroristic threat directed at the United States? That certainly would be. But the inquiry here is if you are going to take that terrorist threat and apply it to QIB, you have to show how QIB is connected to that. Aren't the allegations here that they were the bank that directed the funding, that allowed the funding to go from a bunch of people who wanted to fund this thing through the Al-Madid campaign, which they knew was going to Al-NRSA, which they knew was directing it at the United States? Isn't that the flow? Well, they certainly made the conclusory allegations that the bank was involved with this, but they only identified one transaction, which I believe you referred to earlier. Yeah, but the conspiracy doesn't evolve. So these are two separate jurisdictional things. They argue alternatively conspiracy jurisdiction, which sort of looks at the big picture, and then separately they look at there's one big contact here for which it would give jurisdiction. You and I are talking about the conspiracy part of it. As to that, it seems to me that there's a lot of contacts, and they did know. And we're not at the point when we're looking at, it seems to me, if this complaint was sufficient or not under 12b-6. We're at jurisdiction land. And in jurisdiction land, we just assume the correctness of the allegations and the complaint everyone did, and the complaint alleges those things. I'm just — I fail to see how, if we accept conspiracy jurisdiction, how this wouldn't fall within it. Well, I think there's a two-part answer, Your Honor. One is do take a careful look at those allegations, because although the complaint says a whole bunch of horrible things about the Neusra Front for good reason, there's very little in terms of specifics about QIB and its participation allegedly in this fundraising campaign. There's a second thing to look at is even if you were to find that the plaintiff made a prima facie case for jurisdiction based on these allegations, and again, we think they're entirely conclusory, that's not enough, because QIB submitted evidence that it was not involved in this. And the plaintiff never then met its burden that shifted back to it to submit evidence disproving otherwise. I would point to two particular things of evidence. One is that there are no transactions. The only transactions we're looking at, none of them went to the Neusra Front. The second thing I would point to is in terms of knowledge. The plaintiff says QIB knew about Saad al-Khavi's role in fundraising. They only say this, they only point to some vague reference to due diligence and no information about what that due diligence is. But the evidence doesn't rebut that, does it? It does. Tell me how. Because QIB submitted evidence that al-Khavi was not designated as a terrorist until two years after these alleged events. But that doesn't rebut the knowledge that they knew he was a terrorist and helping fund the terrorist activities, does it? It does, because it shows when the bank would have acquired knowledge. At that point, it was incumbent upon the plaintiff. Counsel, there's allegation that they knew during the relevant time period and there's an affidavit which says that the United States listed this guy two years later. How is that conflicting? Their allegations are, one, really focused on this fundraising campaign directed to the United States that supposedly brought money into the account. We have seen those corresponding account transactions. There's only six. None of them went to the Nusra Front. That rebutted the whole basis, the foundation for saying the bank knew anything about the Nusra Front. Well, what that does is it rebuts the corresponding account issues. But there's still allegations for not the corresponding accounts, for the accounts in Qatar, in the Middle East, that helped funnel money to Nusra, which they knew was being used to kidnap and to terrorize American citizens. Is that not the allegations? That's a very vague allegation with no factual support for it, and that's why it doesn't meet the prima facie burden of articulating facts upon which the court can conclude that the bank actually did know and actually did participate in this case. I just wonder how much that's a 12 v. 6 argument rather than a lack of personal jurisdiction argument. I think, of course, it is relevant to 12 v. 6, which the court never reached because it didn't have to. But if anything, in looking at personal jurisdiction, the plaintiff has a much higher burden to demonstrate to the court that the underlying facts, if considered to be true, assumed to be true, would actually support a finding that the bank knew and participated in this scheme. And that's where you don't have the information. You do have evidence that has been submitted and nothing contradicting it. So at the end of the day, 12 v. 6 would be another vehicle, but that's a different standard and a different burden of proof than what the plaintiff ultimately bears here, and they admit that they have the burden of proof. And it's a higher burden of proof than just allegations. Your Honor, the transactions, and I guess I won't address the first three transactions because there's really no issue about whether or not somebody like the United Nations was using funds it received to support terrorism. So we're really stuck with, or I should say the appellant is really stuck with three post-escape transactions, of which he only really points to one and says that is the pivotal one. But it cannot be the pivotal one because the plaintiff made, I think, a very significant admission. He said that transaction documents are far from the most reliable evidence of terror financing. So yes, those transaction documents, according to the plaintiff's own words, are that they are far from reliable. But even if you look at the post-transaction documents, it didn't go to the Nusra Front. It went to Hazza al-Khabi. And then from there, you're looking at a complaint that alleges, well, Hazza al-Khabi gave the funds to Saad al-Khabi, who then gave the funds to the Nusra Front that then were used to support terrorism, which is completely speculative. It's unsupported by anything other than conclusory allegations. I guess I'm confused that you're using that statement against opposing counsel when it seems to be just a statement that we would all acknowledge, that nobody is expecting anybody who's involved in terrorism to actually have documents that says subject matter terrorism. That's right. So I think that's his point, is that this is going to be a very extensive discovery issue if we are able to go forward on the merits. I don't think that saying that we wouldn't expect a bank to have documents that say, hey, we're funding terrorism is a remarkable statement. That's correct. But I would also submit that the court can't say that because a transactional document on its face appears to be legitimate, that nevertheless the court will find that the plaintiff met its burden to demonstrate that funds through that transaction went to the Nusra Front. So certainly those documents would be, if they had gone to the Nusra Front, would still be suspect. There needs to be more. In this case, though, we introduced evidence, documentary evidence, showing that transfer did not go to the Nusra Front and the plaintiff never came back with evidence saying otherwise. But perhaps the easiest thing for the court to rest on with respect to this transaction is, as we've discussed today, the transaction occurred three months after the plaintiff was no longer in captivity. That timing is critical. They have said, well, money is fungible. But even the fungibility of money cannot cure the fact that when that $6,000 was transferred to the account of Haza al-Khavi, it could not have been used in any manner whatsoever to support the kidnapping and detention of the plaintiff. You can't use money for something that happened in the past. I think we understand that. And you're about three minutes over, so I think we'll cut you off there. No, no, no. I'm not very good at interrupting. That's my best effort. Thank you very much. All right. Let's hear the rebuttal. All right. Let me start by noting what I think Judge Luck observed, which is that the minimum contacts analysis based on the correspondent account transactions and the conspiracy are separate. There is an allegation, uncontroverted, that the al-Khavi account was used to fundraise for the Madid campaign and finance the news refront. That has not been rebutted. Just because QIB came back with documentary evidence of six transactions in the United States does nothing to rebut the allegation that this account was, in fact, used to finance the Madid campaign. How does the 12B6 standard interact with where we're at with the lack of personal jurisdiction standard? So it's the plaintiff's initial burden to make a prima facie case of jurisdiction. If the defendant comes forward with evidence, the plaintiff then has to come forward with their own evidence. To the extent the allegations are controverted, an uncontroverted allegation must still be accepted as true. So the allegations don't need to meet the plausibility standard for us to treat them as true for the first step? I'm not aware of a case holding that has to meet the plausibility standard. The cases refer to a prima facie case of jurisdiction. I'll note to your question from my argument, Judge Luck, about connecting the conspiracy to knowledge that it would affect the United States. Congress has actually made that finding in the Justice Against Sponsors of Terrorism Act. It's cited in our brief. What Congress said was that supporters of terrorism who provide resources to terrorist groups necessarily direct their activities to the United States and should reasonably anticipate being hailed into court there. I think that reflects the common sense view that terroristic acts against Americans necessarily affect the United States and that people who are supporters of terrorism should expect that they will be held accountable in U.S. court. I'll also note that the allegations are uncontroverted, that QIB was a participant in this conspiracy. That includes its use of... It agreed to open this account. It knew the purposes. You noted, Judge Luck, about its due diligence. And it let that happen for a year until the fundraising campaign was shut down because it was known to support terrorism. And finally, we haven't discussed yet... We did attempt to seek what QIB knew about these transactions at its deposition. We have noted that it seems unlikely that the memo lines of these transactions would say, for the Nusra Front. We attempted to ask QIB about those transactions at a 30b6 deposition. QIB refused to answer. We've explained in our brief why the refusal to answer is relevant to the analysis, too. I mean, we have no way to know what QIB knew about these things except to ask it, and QIB refused to answer. Unless the court has further questions. Thank you very much. All right, that case is submitted, and we'll move to the fourth.